*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LAURA J. O'BRIEN, | ) | |
| | ) | Supreme Court No. S-18217 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 1JU-10-00742 CI, |
| v. | ) | 1JU-19-00944 CI |
| | ) | |
| FRANCIS X. DELAPLAIN, | ) | O P I N I O N |
| KASSANDRA SPENCER, KENNETH | ) | |
| M. O'BRIEN, WILLIS A. EHLERS, | ) | No. 7723 – September 27, 2024 |
| and CENTRAL COUNCIL OF | ) | |
| TLINGIT AND HAIDA INDIAN | ) | |
| TRIBES OF ALASKA, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Ian Gerard van Tets, Van Tets Legal Services, Anchorage, for Appellant. Notice of nonparticipation filed by Blake F. Quackenbush, Law Offices of Blake Fulton Quackenbush, Anchorage, for Appellees Francis X. Delaplain and Kassandra Spencer. Notice of nonparticipation filed by Holly Handler, Juneau, for Appellee Central Council of Tlingit and Haida Indian Tribes of Alaska. No appearance by Appellees Kenneth M. O'Brien and Willis A. Ehlers.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

# I. INTRODUCTION

Two years after leaving her children in the care of their uncle and aunt in Canada, a mother sought to have them returned to her in Juneau. The uncle and aunt opposed, arguing that it was in the children's best interests to remain with them. Simultaneous child custody proceedings commenced in the Alaska superior court and in Canadian courts; Alaska ultimately concluded it had jurisdiction over the dispute. Following a custody trial, the uncle and aunt were granted physical and legal custody of the children. The mother appeals, alleging that the court made a number of legal and factual errors. Because the superior court's factual findings are supported by the record and because it used the proper legal framework in this custody dispute, we affirm the superior court's order.

# II. FACTS AND PROCEEDINGS

## A. Facts

This case concerns the custody of Laura O'Brien's children, Eliza and Ben.[1] Eliza's father is Kenneth O'Brien. Kenneth and Laura were married in 2004 and divorced in 2011. Laura was granted sole legal and primary physical custody. Ben's father, Willis Ehlers, is a member of the Central Council Tlingit and Haida Tribes of Alaska; Ben is therefore an Indian child as defined in the Indian Child Welfare Act (ICWA).[2]

The children spent part of the summer of 2016 in Hay River, Northwest Territories, Canada with Laura's brother, Francis Delaplain, and his wife, Kassandra Spencer. Ben and Eliza returned to Juneau the following school year, and again stayed

---

[1]    We use pseudonyms for both of Laura's children to protect their privacy. Because Eliza is now an adult, this case is moot with respect to her custody.

[2]    25 U.S.C. § 1903(4). (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.")

with Francis and Kassandra in the summer of 2017. This time, Laura joined her children for the summer. After returning briefly to Juneau by herself, Laura moved to Hay River to live with her children, Francis, and Kassandra in August 2017. Laura apparently moved to Hay River to get a "fresh start." Eliza and Ben began school there that fall.

Laura moved to Oregon in November 2017. Just before she left Hay River, Laura signed a guardianship document purporting to grant Francis and Kassandra "all the rights and obligations that I have as a parent," including decisions with respect to Eliza's and Ben's medical care, education, and "general welfare." The document contained no provisions for revocation or enforcement.

The parties dispute the reasons Laura left Francis and Kassandra's home and moved to Oregon. Laura claims that Francis and Kassandra forced her to leave without her children, and that she only moved to Oregon because a friend, Codey, offered her a place to stay. Laura also contends Francis and Kassandra began to restrict her communication with her children almost immediately after she left Hay River. Francis and Kassandra assert that Laura moved to Oregon to pursue a romantic relationship after they confronted her about her verbal aggression and substance use.

Laura stayed briefly with Codey after she moved to Oregon. In early December 2017 Laura went to Seattle to stay with a friend who was ill. Laura then moved to Juneau around late January 2018 for about a month and a half. Then she moved back to Oregon with Codey. In March 2018 Laura sent a text message to Francis telling him that she and Codey had "dated for over two years now and ha[d] decided to get married." They did not marry, however, and in early 2019 the relationship ended and Laura moved back to Juneau.

In May 2018 Willis Ehlers sent Francis and Kassandra a letter giving them permission to apply for a passport for Ben; Laura sent a similar letter the next month. Francis and Kassandra traveled to Vancouver, British Columbia with the children and offered to meet Laura and to pay for her lodging; Laura declined. Laura also declined several later offers from Francis and Kassandra to meet them and her children on trips.

Francis and Kassandra obtained permanent residency for Eliza and Ben in spring 2018 so they could receive health care through the Canadian government.

In October 2019 Laura and her mother arrived unannounced in Hay River. Laura apparently intended to take Ben, but not Eliza, to Juneau. Local police became involved and apparently declined to assist Laura. Laura and her mother returned to Juneau without either child.

### B. Proceedings

In November 2019 Francis and Kassandra moved for sole custody of Ben and Eliza in the Supreme Court of the Northwest Territories. Laura filed a cross motion asking the court to decline jurisdiction or to award her custody and require the children's return to Juneau instead. Laura also moved to enforce the custody order in her 2010 Alaska divorce case "for the return" of Eliza and she filed a motion for custody of Ben. This second motion was filed under a new case number and listed Ben's father Willis as the defendant even though it was directed at Francis and Kassandra.

The custody cases were assigned to different judges. Each judge determined that Alaska had subject matter jurisdiction, but for different reasons. In Eliza's case the court ruled that under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) Alaska had jurisdiction because it made the initial custody determination in 2011 and no other state had established jurisdiction in the interim.[3] The judge in Ben's case concluded Alaska had jurisdiction after the Canadian court issued an order declining jurisdiction because of Ben's connections to Alaska. The cases were then consolidated and a custody trial was scheduled.

#### 1. Custody Trial

The trial was held over the course of 11 days between February and August 2021. Eighteen witnesses testified, and the court conducted individual in

---

[3]     *See* AS 25.30.310 (provision for "exclusive, continuing jurisdiction").

camera interviews[4] with the children by videoconference. Laura testified and also presented several family members, family friends, neighbors, and current and former romantic partners to testify about her parenting skills and trustworthiness.

Laura testified that Francis and Kassandra "kicked [her] out" of their home with no warning. She testified that she was unable to find housing in such a small community on such short notice, and that she did not wish to bring Ben and Eliza with her to Oregon because "I didn't know the person that was offering . . . me a place to stay." Laura also said she had health problems while she was in Hay River, and she later sought treatment in Oregon.

Laura testified that Francis was abusive to her. She alleged he had physically abused her once in Hay River. She also described disparaging phone calls he made and the ways he cut her off from Ben and Eliza. Laura testified that Francis told her that the "only way [Francis] would ever cooperate with me, in any way, was if I went ahead and let [him] adopt my children." She testified that Francis was intentionally cordial with her in emails but was "completely different" in person and when speaking on the phone. She stated that she had to "beg" for information about the children, but she conceded that Francis sent pictures and updates about both children's lives.

Ben saw a counselor in Hay River from late 2019 until summer 2020. Laura testified that, contrary to Francis's claims, she did not play a role in ending Ben's counseling in Hay River. She stated that Ben did not want to continue and that the counselor refused to work with Ben because the guardianship document was "nothing" and "didn't give [Francis] any right to sign [Ben] up for counseling." She also testified

---

        **4**      That is "an interview by the judge of a child in a custody case to ascertain the child's preference as to custody placement." *Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 467 n.2 (Alaska 2012).

that she could not exactly remember why Ben's counseling ended, and she stated she planned to enroll him in counseling in Juneau.

Willis Ehlers testified that Laura had raised Ben from birth until Ben moved to Hay River and that his only involvement was paying child support. He testified he "really [had not] spoken to [Ben]." He also testified that he wrote a letter purporting to relinquish his parental rights to Ben, which he understood would make it easier for Laura to be granted custody of the child.[5]

Francis and Kassandra also called several family members, friends, coaches, and teachers to testify about their care for the children and to describe Ben's adjustment to Hay River.

Francis and Laura's sister, Amanda Dehling, testified that she had been present for some phone calls between Francis and Laura when she lived in Hay River, and that she did not hear him making disparaging comments to Laura. Amanda stated that Francis was "making those phone calls happen" between Laura and her children and encouraging the exchange of holiday gifts. And Amanda testified that between 2005 and 2016, when both she and Laura lived in Juneau, she observed Laura consuming alcohol, smoking marijuana, and using prescription pills; she stated that Laura once showed her tramadol[6] pills she had ordered from the internet.

Eliza's father, Kenneth O'Brien, also testified on Francis and Kassandra's behalf. Although he had not seen Eliza in person since September 2016, he supported Francis and Kassandra having custody of her because he knew she was "safe" with them. He testified he had made over two years' worth of child support payments to Laura despite Eliza being in Francis and Kassandra's care, not Laura's. Kenneth also

---

[5]     Julie Delaplain, Laura's mother, testified that she offered Willis "not much" money to write the letter.

[6]     Tramadol is a pain-relieving medication with "opioid-type effects." *Tramadol*, STEDMAN'S MEDICAL DICTIONARY (2014).

testified that Laura's father contacted him in early 2020, asking him to write a letter in support of Laura and "guarantee[ing]" that if he did so, he could "start talking and having communication with [Eliza] again."

Kassandra testified about an incident in which Laura left a school dance that Kassandra, Francis, Laura, and the children attended at Ben's school; she stated that Laura told her she had gone to "go get high." Kassandra recounted another incident in which Laura had unmarked pills delivered to their home, which she told Kassandra were prescription drugs not prescribed to her. She also described Laura's outbursts, testifying that Laura would resort to screaming at the children when frustrated and would then often leave the house.

Kassandra also described the events that led to Laura's departure from Hay River in 2017. She testified that Laura's alcohol use and verbal aggression increased during her stay. Francis and Kassandra explained to Laura that "the situation" with her behavior was unacceptable, and tried to convince her to work with them to make their home "healthy." But Kassandra stated that Laura told them she had already discussed her living situation with Codey, and that Codey and Laura had decided that Laura would move to Oregon and Ben and Eliza would stay in Hay River. Kassandra testified Laura made it clear to her and Francis that she was moving to Oregon for a romantic relationship. Kassandra also testified that she had previously provided Laura with referrals for counseling in Hay River, explained how to get on the local housing list, and helped Laura apply for treatment programs.

Francis also testified. He recounted Laura's longtime struggle with substance abuse, including at least one instance around 2008 in which Laura drove while drinking alcohol with Eliza in the car.[7] Francis testified that Ben was unable to continue counseling because the provider's policies required Laura's consent. Francis

---

[7] In 2014 Laura was convicted of driving under the influence with Ben in the car.

stated Laura informed him that she would be arranging further counseling, but no counseling was ever scheduled, and he did not believe that Laura ever set up any counseling appointments for Ben. Francis stated that initially calls between Laura and Ben occurred three times per week, but because Ben was so upset after the calls, they were reduced to once per week.

Francis testified that he initially invited Laura to Hay River to help her, and he stated he assisted her with her résumé and helped her secure a job offer. He said from approximately November 2017 to February 2018, Laura would sometimes respond to the children by phone and sometimes would not respond at all. After Laura and her mother's unplanned visit to Hay River in October 2019, Laura left a phone at Francis's home, which the children could use at any time to contact their mother or other family members.

Francis and Kassandra also called two expert witnesses as required by ICWA.[8] Kluane Adamek, a citizen of the Kluane First Nation in Canada who "[m]aintains strong relationships" with Tlingit relatives in Alaska, testified. Adamek testified Tlingit families would not customarily leave children with a relative for a period of years without a plan to return, have limited contact with them, or pursue a romantic relationship while leaving the children behind. The second expert, Jaime Browning, was a social worker with extensive experience in children's services and counseling. Browning testified that the length of time Laura had failed to meaningfully participate in her children's lives was "significant" and that there was a serious risk of emotional harm to Ben if returned to Laura's custody.

### 2. Custody Order

The superior court issued a written decision in September 2021 granting Francis and Kassandra legal and physical custody of Ben and Eliza. It found that it

---

[8] *See* 25 U.S.C. § 1912(e) (requiring testimony of qualified expert witnesses in certain child custody proceedings).

would be in their best interests to remain with Francis and Kassandra, pointing to the children's stated preferences to remain with them in Hay River and the fact that they are "thriving" there. The court found that the "past four years that they have been there have been the most stable time of their young lives."

The court also found by clear and convincing evidence that Eliza and Ben's welfare required that they be placed in Francis and Kassandra's custody and that returning them to Laura's custody would be to their clear detriment because of her erratic behavior, substance use, and refusal to enroll Ben in counseling. The court did not find credible much of Laura or her witnesses' testimony. It pointed to text messages that directly conflicted with Laura's testimony that she had not left Canada to pursue a romantic relationship in Oregon; highlighted inconsistencies in Laura's and others' accounts of verbal abuse directed at Laura; discussed Laura's unwillingness to ensure Ben could have counseling in Hay River; and expressed concern that Laura was "unwilling to listen to the children." The court also noted that Laura had repeatedly told her children she was going to harm herself.

Then, because Ben is an Indian child, the court addressed ICWA's requirements.[9] It found by clear and convincing evidence, supported by the testimony of expert witnesses, that returning Ben to Laura's custody would result in serious emotional damage to him, pointing to the evidence supporting its detriment finding. And it found that active efforts had been made to "prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[10] The court found that Francis and Kassandra made active efforts because they worked to arrange individual and family counseling and weekly video chat visits, offered to pay for several of Laura's visits to Hay River, provided Laura a place to stay during her time in Hay River, and

---

[9]     *See* 25 U.S.C. § 1903(4).

[10]    *Id.* § 1912(d).

assisted Laura with housing and job applications.  It observed that Laura did not consistently cooperate with those efforts or, as with counseling, "obstructed" those efforts.

Laura appeals.

## III.  STANDARD OF REVIEW

"Superior courts have broad discretion to award custody."[11]  "We will reverse a custody award only if the superior court abused its discretion or relied on clearly erroneous factual findings."[12]  "We will find an abuse of discretion when the superior court 'consider[s] improper factors in making its custody determination, fail[s] to consider statutorily mandated factors, or assign[s] disproportionate weight to particular factors while ignoring others.' "[13]  "A factual finding is 'clearly erroneous when a review of the record leaves us with the definite impression that a mistake has been made.' "[14]

"Whether the superior court's factual findings . . . satisfy ICWA is a question of law to which we apply our independent judgment."[15]  Whether active efforts were made is a mixed question of law and fact.[16]  " 'Whether returning a child to the parent would likely cause harm is a question of fact' reviewed for clear error."[17]  And

---

[11]     *Rosemarie P. v. Kelly B.*, 504 P.3d 260, 264 (Alaska 2021).

[12]     *Id.*

[13]     *Dara v. Gish*, 404 P.3d 154, 159 (Alaska 2017) (alterations in original) (footnote omitted) (quoting *Osterkamp v. Stiles,* 235 P.3d 178, 183 (Alaska 2010)).

[14]     *Rosemarie P.*, 504 P.3d at 264 (quoting *Dara*, 404 P.3d at 159).

[15]     *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 560 (Alaska 2022) (alterations in original) (quoting *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021)).

[16]     *Id.*

[17]     *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 606 (Alaska 2021) (quoting *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 558 (Alaska 2017)).

"[w]hether the superior court's findings and the expert testimony presented at trial satisfy the requirements of ICWA is a legal question."[18]

We review the superior court's evidentiary rulings for an abuse of discretion.[19] "Errors in the admission or exclusion of evidence warrant reversal only if necessary to ensure 'substantial justice.' "[20] The decision to conduct in camera interviews is discretionary, and it is also reviewed for abuse of discretion.[21]

"We apply our independent judgment to questions of law, including 'the interpretation and application of a statute,' as well as 'whether the superior court applied an incorrect legal standard.' "[22]

## IV. DISCUSSION

Laura makes a number of arguments on appeal. She contends there was insufficient evidence for the superior court to rule as it did and that it failed to consider certain evidence when it determined the children's best interests. She argues the superior court erred when it conducted in camera interviews with the children, and that it erred by admitting certain evidence. She also argues the court improperly qualified ICWA expert witnesses, that it erred by determining Francis and Kassandra made active efforts to reunite the family, and that it erred by considering the children's placement with Francis and Kassandra to be a "foster care placement" under ICWA. We see no error in the superior court's custody decisions.

---

[18]    *Id.* (internal quotation marks omitted).

[19]    *Guilford v. Weidner Inv. Servs. Inc.*, 522 P.3d 1085, 1093 (Alaska 2023).

[20]    *Id.* (quoting *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016)).

[21]    *Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 474 (Alaska 2012).

[22]    *Williams Alaska Petroleum, Inc. v. State*, 529 P.3d 1160, 1176 (Alaska 2023) (internal brackets omitted) (quoting *Oakly Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1078 (Alaska 2015)).

**A.   The Superior Court Did Not Err By Awarding Custody To Francis And Kassandra.**

Laura argues that the superior court erred by awarding custody of the children to relatives who are not their parents rather than to her. She asserts that the court erred by concluding that Francis and Kassandra had met the requirement that we set forth in *Evans v. McTaggart*[23] to show that the parent is unfit or that the children's welfare requires they be in the custody of a nonparent.[24] She argues that the superior court was required first to find that she was an unfit parent before it could award custody to a third party, and the court failed to do so. Laura also contends that the evidence was not sufficient to support the court's finding that the children's welfare required them to be in the custody of a nonparent. And she challenges the court's best interests finding. We see no error in the superior court's legal analysis or abuse of discretion in its custody decision.

**1.   The superior court properly applied our decision in *Evans v. McTaggart*.**

In *Evans v. McTaggart* we addressed a similar situation where nonparent relatives sought custody of a child — their grandson.[25] We explained what Alaska law requires for a third party to overcome the legal preference for awards of custody to a parent.[26] A third party must show either that the parent is unfit or "that the welfare of the child requires the child to be in the custody of the non-parent" because the child

---

[23]   88 P.3d 1078 (Alaska 2004).

[24]   *See id.* at 1085.

[25]   *Id.* at 1079.

[26]   *Id.* at 1084. The parental preference "protects parents' constitutional liberty interest in the care, custody, and control of their children." *Husby v. Monegan*, 517 P.3d 20, 28 (Alaska 2022); *see also Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (acknowledging "fundamental right of parents to make decisions concerning the care, custody, and control of their children").

would suffer "clear detriment" if placed in the parent's custody.[27]  In light of the importance of a parent's right to raise their children, we required that the third party must prove entitlement to custody by clear and convincing evidence.[28]

This case resembles *Evans*:  although they are close relatives, Francis and Kassandra are not Eliza and Ben's parents; Laura is their mother.  Therefore, in order to be awarded custody Francis and Kassandra must demonstrate that Laura is an unfit parent or that Ben and Eliza's welfare requires that they be placed in Francis and Kassandra's custody.[29]  Contrary to Laura's assertion, the superior court was not required to find she was an "unfit parent."[30]  The superior court did not err when it based its third-party custody award on its finding that Eliza and Ben would suffer clear detriment if returned to their mother's custody.[31]

Laura also claims that Francis and Kassandra did not provide clear and convincing evidence that the children's welfare required them to be in Francis and Kassandra's custody.  She argues that the court relied almost entirely on its interviews with the children, that there was "[n]o evidence . . . at trial to impeach the credibility of any of [her] witnesses," and that as a result, the court clearly erred when it found that

---

[27]     *Evans*, 88 P.3d at 1084-85.

[28]     *Id.* at 1085-86.

[29]     *See id.* at 1085; *see also Dara v. Gish*, 404 P.3d 154, 162-65 (Alaska 2017) (affirming custody grant to grandparents where child would suffer clear detriment if returned to parent's custody); *Rosemarie P. v. Kelly B.*, 504 P.3d 260, 265-67 (Alaska 2021) (affirming custody award of joint custody under third-party framework to mother's former same-sex partner).

[30]     *See Rosemarie P.*, 504 P.3d at 265 ("This case involves only the 'welfare of the child' prong."); *see also Dara*, 404 P.3d at 160-62 (affirming custody award based on "welfare of the child" prong only).

[31]     To the extent Laura argues our decision in *Evans* is in conflict with the federal constitution, she failed to raise that argument before the superior court and it is therefore waived.  *See Rhodes v. Erion*, 189 P.3d 1051, 1055 (Alaska 2008).

-13-                                                    **7723**

they were not credible.[32]   But "[f]actual determinations, including judging the credibility of witnesses, [are] left to the fact finder,"[33] and "[w]e afford particular deference to factual findings based primarily on oral testimony, because the trial court is better suited to judge the credibility of witnesses and weigh conflicting evidence."[34]

The court heard from many witnesses over 11 days. And it generally credited the testimony from witnesses supporting Francis and Kassandra over those supporting Laura. In particular, Francis and Kassandra's witnesses described incidents like Laura's substance use and erratic behavior and the impact these incidents had on the children.

Laura's testimony, on the other hand, was inconsistent with others'. For example, Laura described being prevented from having any contact with Eliza and Ben after she left Canada. But she conceded in her testimony that she was provided updates about the children's lives and activities in Hay River, and the record demonstrates that she was not "cut off" from the children. The superior court also heard a recording of a call between Laura, Eliza, and Ben, in which Laura refused to acknowledge her children's description of distressing events they recalled from earlier in childhood.[35]

The superior court did not clearly err when it found by clear and convincing evidence that it would be to the children's detriment to return to Laura's custody and that their welfare required that they remain with Francis and Kassandra.

---

[32]   We address Laura's argument that conducting in camera interviews of Eliza and Ben was an abuse of discretion below.

[33]   *State v. Grubb*, 546 P.3d 586, 603 (Alaska 2024).

[34]   *Vang v. Xiong*, 531 P.3d 979, 983 (Alaska 2023) (quoting *Kristina B. v. Edward B.*, 329 P.3d 202, 207 (Alaska 2014)).

[35]   Laura also argues the court should have excluded this recording because she claims that it was made without her consent and was therefore illegal. But the exclusionary rule she seeks to invoke is a rule for criminal cases; this is a civil case and it does not apply. *See* Alaska Rule of Evidence 412.

**2.** **The superior court did not err by finding that it would be in the children's best interests to remain with Francis and Kassandra.**

Laura makes a number of arguments asserting that the superior court's best interests analysis was flawed, including that it abused its discretion by conducting in camera interviews with Eliza and Ben.

We first address Laura's contention that the superior court abused its discretion when it interviewed Ben and Eliza in camera. The trial judge in this case conducted interviews by videoconference because the children were still living in Canada at the time of the Juneau custody trial. Laura argues that, because the court was unable to ensure that no one influenced the children's answers in the interviews, it was improper for the court to conduct the interviews or to consider the children's stated preferences. She also argues in general terms that her due process rights were violated.

Courts frequently interview children in custody disputes if the children are of "sufficient age and capacity to form a preference."[36] That preference is one of the statutory factors a court may consider when making a best interests determination in a child custody case.[37] We have held that the superior court has discretion to conduct such interviews in camera for the purpose of learning the child's custody preference.[38] While judges usually conduct these interviews with the child in their chambers at a courthouse, rather than by videoconference, Eliza and Ben were located in a different country. Laura, in arguing her own rights were violated, also observes that this kind of

---

[36]     AS 25.24.150(c)(3); *see, e.g.*, *Jenkins v. Handel*, 10 P.3d 586, 590 (Alaska 2000) (noting superior court interviewed children in custody case to learn custodial preferences).

[37]     *See* AS 25.24.150(c).

[38]     *See Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 473 (Alaska 2012). In that case we also cautioned that the interview must be limited "to the issue of the child's parental preference," and that such interviews "are not to be used as a method of obtaining additional information on other issues in the custody proceeding," including other best interests factors. *See id.* at 474.

interview "creates a risk" of infringing on parents' due process rights. But in *Helen S.K.* we explained that this infringement can be avoided if the parties are "given a summary of the information provided in the in camera interview and to be relied on at trial."[39] The superior court provided the parties with a detailed summary of its interview with Eliza and Ben on record. The court did not abuse its discretion by conducting the interviews by videoconference.

Laura argues that a number of the factual findings supporting the court's best interests determination are clearly erroneous. Laura first argues that the superior court erred by failing to consider Francis and Kassandra's "unilateral decision" not to return the children to her custody. She contends that they violated the existing custody order and that demonstrated Francis and Kassandra were not willing "to facilitate and encourage a close and continuing relationship" with her.[40] But Francis and Kassandra were not parties to the custody case between Laura and Kenneth O'Brien. And Laura conceded and the trial court expressly found that the children were not prevented from contacting Laura.[41] This was not a clearly erroneous factual finding.

Laura next contends that the trial court erred because it placed "excessive weight" on Eliza and Ben's preference to remain in Hay River, particularly because it was based on their videoconference interviews. But we have held that the superior court has discretion in determining what weight to give a child's preference.[42] Though Laura

---

[39]     *Id.* at 474.

[40]     *See* AS 25.24.150(c)(6).

[41]     Laura also asserts the superior court failed to consider "restrictions" Francis and Kassandra placed on the children, which she asserts limit contact between Eliza and Ben and members of their extended family in Juneau. But she does not cite any statutory factor this might weigh upon or a legal rule requiring explicit consideration of that information. *See Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005) ("We do not consider arguments that are inadequately briefed.").

[42]     *See Michele M. v. Richard R.*, 177 P.3d 830, 838 (Alaska 2008).

contends that the trial court placed "excessive weight" on their preference, the court did not clearly err by finding that the children preferred to remain in Hay River and it did not abuse its discretion when it placed greater weight on that factor over others when considering the children's best interests.

Laura next argues the superior court erred when it found that "other witnesses" in addition to Francis and Kassandra testified as to Laura's "unstable behavior and substance abuse." Laura is correct that there were not "other witnesses"; only one other witness supported Francis and Kassandra's testimony about her behavior and substance abuse. Laura and Francis's sister, Amanda Dehling, testified that between 2005 and 2016, when both she and Laura lived in Juneau, she observed Laura consuming alcohol, smoking marijuana, and using prescription pills. She also stated that Laura once showed her tramadol pills she had ordered from the internet. Laura argues that the court should not have credited Amanda's testimony because she "did not . . . personally spen[d] time with Laura in the time prior to her move to Hay River, during her time in Hay River, or after she left Hay River." But Amanda was present in Hay River when Laura arrived unannounced to remove Ben and return with him to Juneau. And it is the trial court's province to weigh evidence; we will not reweigh it on appeal.[43] Although only one "other witness" supported Francis and Kassandra's testimony on this issue, the superior court did not clearly err when it found that additional testimony supported Francis and Kassandra's testimony about Laura's behavior and substance use.[44]

---

[43]     *See Fiehler v. Mecklenburg*, 538 P.3d 706, 722 (Alaska 2023).

[44]     Laura also argues that Francis and Kassandra's testimony about the revocability of the guardianship was contradictory. However, the testimony she points to is not contradictory; both Francis and Kassandra consistently testified that they believed the guardianship was revocable and "not a permanent custody order."

Laura next contends the court clearly erred when it found that she was unwilling to do "whatever was necessary to enable both children to have badly needed counseling." She argues that it was actually Francis and Kassandra that "blocked" counseling for Ben. She points to her own testimony that she planned to enroll Ben in counseling in Juneau through tribal resources. But Francis testified otherwise, stating that Ben was unable to continue because Laura had not consented, and that Laura never followed through or arranged counseling after stating she would do so. And the court received evidence of an email exchange in which Ben's counselor in Hay River confirmed with Laura that they had mutually agreed that counseling for Ben would cease. It is up to the trial court to weigh evidence and determine witness credibility;[45] it did not clearly err by finding that Laura failed to ensure both children received counseling.[46]

Laura also takes issue with the court's reference to "violence in the home" in its custody order, asserting that the court "failed to appropriately consider" domestic violence committed against her by Kenneth O'Brien during their marriage. She argues the court improperly considered violence committed by someone else as a factor weighing against *her* in its best interest finding. But the court only mentioned violence in its analysis when it stated that "[the children] remember their time with [Laura] as a time of turmoil, instability and violence." The court did not make any other factual finding about violence in Laura's home.

Finally, Laura argues that the superior court "failed to appropriately consider" her allegations that Francis committed domestic violence against her. Laura

---

[45] *See Mecklenberg*, 538 P.3d at 722.

[46] Laura also argues that the court erred by excluding as hearsay documents that would have contradicted Francis's testimony. But the documents were never offered into evidence; instead they were used to refresh Francis's recollection of the total number of counseling sessions Ben attended.

asserts that the court was required to give "detailed consideration" to the allegations, citing AS 25.24.150. The best interest factors enumerated in AS 25.24.150(c) require that the court consider "any evidence of domestic violence . . . in the proposed custodial household." But the statute does not require the superior court to take further action unless it *finds* that a party had committed domestic violence.[47] Laura correctly acknowledges that her claim of error boils down to a credibility issue, and the court did not find Laura's allegations against Francis credible. The superior court did not clearly err when it found that Francis had not committed domestic violence against Laura.[48]

## B. The Superior Court Correctly Applied The Indian Child Welfare Act.

The superior court determined that ICWA governs this case because Ben is an Indian child. It also concluded that an award of custody to Francis and Kassandra would constitute a "foster care placement" under ICWA. ICWA defines a "foster care placement" as:

> [A]ny action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated.[49]

As a result, the court reasoned that Francis and Kassandra were required to prove by clear and convincing evidence, supported by the testimony of qualified expert witnesses, that Ben's continued custody by Laura is likely to result in serious emotional

---

    **47**    *See* AS 25.24.150(j) ("*If* the court *finds* that a parent has a history of perpetrating domestic violence . . . .") (emphasis added).

    **48**    Laura also raises factual allegations on appeal that were not raised in the superior court. But we "will not consider on appeal new arguments which . . . depend on new . . . facts." *Kaiser v. Umialik Ins.*, 108 P.3d 876, 881 (Alaska 2005).

    **49**    25 U.S.C. § 1903(1)(i).

or physical damage to him.[50]  And it concluded that Francis and Kassandra had the burden of showing that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[51]

The superior court referred back to its findings that Eliza and Ben would suffer clear detriment if returned to Laura's care to support its finding by clear and convincing evidence that Ben would suffer serious emotional damage.  It also concluded this was supported by the testimony of expert witnesses Jaime Browning and Kluane Adamek.  Finally, it found that Francis and Kassandra had made active efforts, and it enumerated those efforts.  It noted Francis and Kassandra had attempted to arrange individual and family counseling and weekly video chat visits, had offered to pay for visits to Hay River and provide Laura a place to stay during visits, and had made efforts to help Laura obtain housing and employment before she departed Hay River.

Laura argues that the superior court erred by finding this case amounted to a "foster care placement," thereby triggering ICWA's more stringent substantive requirements.  She also challenges the court's determination that Francis and Kassandra made active efforts, its qualification of Browning and Adamek as expert witnesses, and its finding that Ben would suffer serious emotional damage if returned to Laura's care. We see no error in the superior court's findings and conclusions pursuant to ICWA.

### 1.    The custody action was a "foster care placement" under ICWA.

Laura claims that the court committed legal error by treating its custody award to Francis and Kassandra as a "foster care placement," which required it to make

---

[50]    *See id.* § 1912(e).

[51]    *See id.* § 1912(d).

further findings under ICWA's more protective standards.[52]  She asserts that the case does not involve a foster care placement because no "Provincial, State, or Tribal authority sought a foster placement."  And she instead asserts that Francis and Kassandra should have been required to make a report to a child protection agency in Canada or Alaska if they "thought the children were in danger," rather than attempting to "steal her children from her for their own enjoyment."

The superior court properly determined that awarding custody to Francis and Kassandra amounted to a foster care placement as defined by ICWA.[53]  Ben is an "Indian child" placed in the "home of a guardian" — Francis and Kassandra.  Laura "cannot have [him] returned upon demand" because Francis and Kassandra have been awarded custody, but her parental rights have not been terminated.

"Since the early days of ICWA, we have rejected the claim that ICWA applies 'only to custody proceedings involving the removal of Indian children from their homes by nonfamily public and private agencies.' "[54]  We have applied ICWA to a variety of private disputes over children's custody:  a custody dispute between grandparents,[55] a custody dispute between a father and a stepfather after the mother's death,[56] and "custody disputes within the extended family," even when the case "concerns a voluntary placement within the family."[57]

---

[52]  *See id.* § 1912(d), (e).  We observe that by requiring Francis and Kassandra to meet ICWA's more stringent standards, the court provided heightened protection to Laura's parental rights.

[53]  *Id.* § 1903(1)(i) (defining "foster care placement" under ICWA).

[54]  *Rice v. McDonald*, 390 P.3d 1133, 1136 (Alaska 2017) (quoting *A.B.M. v. M.H.*, 651 P.2d 1170, 1172 (Alaska 1982)).

[55]  *See Starr v. George*, 175 P.3d 50, 54-55 (Alaska 2008).

[56]  *See J.W. v. R.J.*, 951 P.2d 1206, 1208, 1214 (Alaska 1998), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1084-85 (Alaska 2004).

[57]  *See A.B.M.*, 651 P.2d at 1173.

In *J.W. v. R.J.* a child's father challenged a custody award to the child's stepfather after the mother died.[58]  The child had been in the stepfather's physical custody prior to litigation.[59]  We held that although the father did not previously have physical custody, "the proceedings still removed the child from the father's legal custody" when the stepfather was granted custody.[60]  Accordingly we concluded that the custody order constituted a "foster care placement," even though an Indian child had not been literally removed from a parent's custody at the conclusion of proceedings.[61]

We reached a similar conclusion in *Rice v. McDonald*.[62]  In that case the children's father murdered their mother, and the father's sister moved the children to Texas; maternal relatives were not notified when the paternal relatives filed for custody of the children.[63]  We reasoned that although the father was in jail and the children were not in his physical custody, because the applicant sought to "remove the children from [the father's legal custody], place them in her home, and prevent [the father] from having the children returned upon his demand," the factual circumstances constituted a foster care placement under ICWA.[64]

The circumstances surrounding Ben's custody are similar, and Laura presents no argument why we should depart from our precedent.  Francis and Kassandra sought to "remove" Ben from Laura's custody and place him in their custody, but Laura's parental rights were not terminated.  The superior court correctly determined

---

[58]  951 P.2d at 1208.

[59]  *Id.*

[60]  *Id.* at 1213.

[61]  *Id.*

[62]  390 P.3d 1133, 1136 (Alaska 2017).

[63]  *Id.* at 1135.

[64]  *Id.* at 1137.

that placing Ben in Francis and Kassandra's custody was a "foster care placement" as defined by ICWA.[65]

### 2. The superior court did not abuse its discretion by qualifying Francis and Kassandra's experts as expert witnesses.

ICWA requires the party seeking a foster care placement to prove by clear and convincing evidence, including the testimony of qualified expert witnesses, that the Indian child would suffer serious emotional or physical damage if placed in the parent's custody.[66] Francis and Kassandra presented two expert witnesses: Kluane Adamek and Jaime Browning. Laura argues that it was error to qualify them as experts because they each lacked the necessary experience and training. The superior court did not abuse its discretion when it qualified them as experts.

Laura argues that because Kluane Adamek is a member of the Inland Tlingit of Canada, she is not qualified to testify as an expert regarding Ben's tribe, the Coastal Tlingit and Haida Tribes. She also argues that Adamek lacked expertise in child psychology and custody and was not qualified because she did not speak to Ben or any of his relatives that are Tribal members.

"ICWA itself does not define 'qualified expert witness' or explain what testimony such a witness must provide."[67] The Bureau of Indian Affairs (BIA) issued regulations in 2016 explaining ICWA's qualified expert witness requirement:

> A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be

---

[65] *See* 25 U.S.C. § 1903(1)(i).

[66] 25 U.S.C. § 1912(e).

[67] *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1009 (Alaska 2022).

qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe.[68]

We have previously noted that the BIA explained the "importance of cultural context in informing a court's findings about the likelihood of serious damage to the child."[69] It emphasized that Congress's purpose in passing ICWA was to "make sure that Indian child-welfare determinations are not based on 'a white, middle-class standard,' " and that requiring cultural expertise "ensures that relevant cultural information is provided to the court and that the expert [causal relationship] testimony is contextualized within the Tribe's social and cultural standards."[70]

We have also explained that a cultural expert's testimony "must somehow be grounded in the issues or questions presented in the case" in order to provide "meaningful assistance to the court."[71] We discussed examples of how to provide the necessary grounding: allowing the expert to view relevant records, providing the expert with information about the case, and asking detailed questions that "provide the expert with important context."[72] Finally, we have held that "if one witness is qualified to testify and does testify about the causal relationship, then a separate expert qualified to testify about tribal culture need not also directly opine on causation"; in other words, the testimony of two expert witnesses can be aggregated.[73]

---

[68]    25 C.F.R. § 23.122(a) (2016).

[69]    *See Cissy A.*, 513 P.3d 999, 1009-10 (Alaska 2022) (citing Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,829 (June 14, 2016).

[70]    *Id.* (alteration in original) (quoting Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,829 (June 14, 2016)).

[71]    *Id.* at 1017.

[72]    *Id.*

[73]    *See id.* at 1016; *see also Oliver N. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 171, 178-79 ("A tribal expert does not need to be qualified to speak to the likelihood of harm to the child if there is a second qualified expert who can . . . .").

The superior court did not abuse its discretion when it qualified Adamek as a cultural expert witness. Adamek testified she was one of ten regional chiefs in the Canadian Assembly of First Nations. She had previously served in other roles including trustee of the Kluane First Nation Trust and founder of a northern indigenous emerging leaders group. Adamek also testified that she led the planning of a gathering of Tlingit, Tahltan, and Kaska youth in the Yukon to help them feel "emotionally supported" and to continue to develop connections to their culture. And although she does not belong to the same Tlingit tribe as Ben, she regularly participates in a gathering called Celebration in Southeast Alaska with the Coastal Tlingit. Adamek also testified that she has numerous personal ties to the Coastal Tlingit, described similarities in the Tribes' history and practices, and testified as to her ability to speak about Tlingit cultural practices. The superior court did not abuse its discretion when it qualified Adamek as an expert regarding the cultural practices of Ben's Tribe.

Laura also argues the court abused its discretion when it qualified Jaime Browning as an expert witness. Laura contends that Browning lacks the expertise required to satisfy ICWA's expert testimony requirements. Laura also argues that Browning improperly relied on information other than her own observations in testifying.

The 2016 BIA regulations also outline the requirements for expert witness testimony about whether "the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[74] We have recognized that "[t]he expert witness who is qualified to draw this causal connection must have an 'expertise beyond normal social worker qualifications.' "[75]

---

[74] 25 C.F.R. § 23.122(a) (2016).

[75] *Eva H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1050, 1054 (Alaska 2019) (quoting BUREAU OF INDIAN AFFS., U.S. DEP'T OF THE

And though we have not defined "normal social worker qualifications,"[76] "witnesses we have considered to be clearly qualified under ICWA had substantial education in social work or psychology and direct experience with counseling, therapy, or conducting psychological assessments."[77]

Browning's qualifications go beyond those of a "normal social worker." She has a master's degree in social work and additional licensing in forensic social work. Her experience includes over 15 years in the child protection field, including working as an Office of Children's Services (OCS) ICWA family services supervisor and as a caseworker in a therapeutic drug court. She also worked with adolescents in a residential treatment center. Prior to her work at OCS, Browning worked with mentally ill individuals on community case management and medication compliance. We have affirmed superior courts' qualification of Browning as an expert in a number of recent ICWA cases.[78]

Laura argues the court erred by permitting Browning to testify as an expert witness because she is neither a psychologist nor a psychiatrist. She also points out that Browning's experience does not include "child counseling, working with families that had been separated, or working with families that were attempting to reunite."

---

INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 54 (Dec. 2016)), *abrogated by Cissy A.*, 513 P.3d at 1013-15.

[76]   *Id.* at 1055, 1057.

[77]   *Id.* at 1057.

[78]   *See Addy S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17427, 2020 WL 915975, at *5 (Alaska Feb. 26, 2020); *Daphne O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, Nos. S-16960/16962, 2020 WL 1933651, at *11 (Alaska Apr. 22, 2020); *Julio A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17603, 2020 WL 4497830, at *7 (Alaska Aug. 5, 2020); *Trisha D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17696, 2020 WL 7238381, at *5-*6 (Alaska Dec. 9, 2020); *Jenny A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, Nos. S-17670/17672, 2021 WL 1400898, at *6-*7 (Alaska Apr. 14, 2021).

Although Laura makes several attacks on Browning's qualifications, Browning's experience, training, and education demonstrate that she meets ICWA's stringent expert witness requirements.

Laura's argument that Browning inappropriately relied on hearsay also fails. She argues that Browning based her opinion on information she learned from Francis and Kassandra instead of personal knowledge. But Evidence Rule 703 specifically provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing" and "need not be admissible in evidence."[79]

The superior court did not abuse its discretion when it qualified Adamek and Browning as experts.[80]

### 3. The superior court did not err by determining Francis and Kassandra made active efforts.

Laura argues that Francis and Kassandra failed to make active efforts as ICWA requires.[81] "Any party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[82]

---

[79] Alaska R. Evid. 703.

[80] Laura also argues that the court clearly erred because it relied on Adamek and Browning's testimony to find that returning Ben to Laura's custody would be likely to cause him harm. But her argument depends upon our agreement with her that it was error to consider them as expert witnesses, and because we conclude their qualification as experts was appropriate, this argument fails.

[81] *See* 25 U.S.C. § 1912(d).

[82] *Id.*

The BIA regulations define active efforts as "affirmative, active, thorough, and timely."[83] We "conduct[] an active efforts inquiry on a case-by-case basis because 'no pat formula' exists for distinguishing between active and passive efforts."[84] We have given examples of passive efforts, such as instructing the parent to obtain employment without taking any further steps to offer resources or help the parent develop job skills.[85] We have contrasted such passive direction to "[a]ctive efforts . . . where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own."[86] And we have directed that efforts must be "tailored to the facts and circumstances of the case," but recognized "the active efforts requirement does not require perfection."[87] We have made clear that we look at active efforts "in [their] entirety."[88] Finally, "a parent's actions have a place in the court's determination of whether OCS's efforts satisfy the ICWA standard."[89]

The superior court found that Francis and Kassandra made active efforts and it enumerated those efforts. It pointed to "attempts to set up counseling for the children and family counseling, weekly video chat visits, offers to pay for visits to Hay River, providing Ms. O'Brien a place to live when she came to Hay River with the

---

[83]     25 C.F.R. § 23.2 (2016).

[84]     *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561 (Alaska 2022) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013)).

[85]     *See id.*

[86]     *Id.* (quoting *A.A. v. State, Div. of Fam. & Youth Servs., Off. of Child.'s Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[87]     *Id.* (first quoting 25 C.F.R. § 23.2 (2016); and then quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011)).

[88]     *Denny M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 365 P.3d 345, 350 (Alaska 2016).

[89]     *Mona J.*, 511 P.3d at 562.

children, and efforts to help her procure housing and employment in Hay River." The court also observed that Laura has not always cooperated, and has sometimes "obstructed" these efforts.

Laura argues that the superior court improperly considered events that occurred before the custody dispute and failed to consider the testimony of her witnesses which showed Francis and Kassandra's "active opposition to the maintenance of [Ben]'s Indian family." She claims that Francis and Kassandra "cut off all contact" between the children and herself, her mother, and Ben's extended family in Juneau. But Laura's argument largely turns on her own view of the evidence, which the court found was not credible.

Laura does not dispute that she initially moved to Hay River to get a fresh start with her children, or that Francis and Kassandra offered their home to her until she could find her own housing. Francis also tried to arrange counseling for the children, set up weekly video chat visits, helped Laura obtain housing and employment, and offered to pay for her to visit the children in Hay River or while they vacationed elsewhere. Kassandra testified that she referred Laura for counseling while she lived in Hay River, explained how to get on the local housing list, and helped Laura apply for treatment programs. Kassandra also testified that she enrolled herself, Francis, and Laura in a family communication application while Laura was away from Hay River, but Laura declined several invitations to use it.

Reunification efforts must be tailored to the particular case but need not be perfect.[90] Francis and Kassandra assisted Laura with housing, job, and treatment applications, and encouraged her to stay in contact with the children. Laura, on the

---

[90] *Id.* at 561.

other hand, repeatedly displayed a lack of cooperation.[91]  The superior court did not err by concluding that the efforts Francis and Kassandra made over the entirety of the time that Ben and Eliza lived with them amounted to active efforts.

## C.  The Custody And Visitation Orders Were Not An Abuse Of Discretion.

Laura finally argues that the superior court did not appropriately consider the hardship its custody and visitation orders placed upon her.  She asserts that traveling to Hay River for visitation "inappropriately limit[s] [her] ability . . . to spend time with and to care for her children" because of the distance and cost of travel.  She argues that it also creates a barrier to visitation for the children's fathers, extended family, and Tribal members.  And she argues that the court failed to take into account the children's extracurricular activities and family and community ties in Juneau.

Laura offers no support for her argument that the superior court was required to consider the specific facts she focuses on and incorporate them into its custody decision.  When it considers a child's best interests, the court may "choose to discuss only those factors it finds relevant," and "need not refer to all of [the factors] in explaining its custody decision."[92]  It also need only discuss factors "that are actually relevant in light of the evidence presented."[93]  We have affirmed orders conditioning a parent's visitation on requirements such as undergoing a substance use evaluation and monthly drug testing[94] or a psychological evaluation.[95]

---

[91]  *See Pravat P.*, 249 P.3d at 272 (noting parent "repeatedly displayed a lack of cooperation" when emphasizing "a parent's lack of cooperation may excuse minor faults" in active efforts).

[92]  *Angelica C. v. Jonathan C.*, 519 P.3d 334, 341 (Alaska 2022).

[93]  *Peterson v. Swarthout*, 214 P.3d 332, 337 (Alaska 2009) (quoting *Thomas v. Thomas*, 171 P.3d 98, 102-03 (Alaska 2007)).

[94]  *Pasley v. Pasley*, 442 P.3d 738, 754-55 (Alaska 2019).

[95]  *Sagers v. Sackinger*, 318 P.3d 860, 866-67 (Alaska 2014).

While the superior court has broad discretion to fashion custody and visitation awards, it abuses that discretion when it "consider[s] improper factors in making its custody determination, fail[s] to consider statutorily mandated factors, or assign[s] disproportionate weight to particular factors while ignoring others."[96] Laura offers no authority to support her claim that the court did so, beyond her assertions that its decision was wrong.[97] We are not persuaded that the court abused its discretion.

## V. CONCLUSION

We AFFIRM the superior court's custody order.

---

[96] *Dara v. Gish*, 404 P.3d 154, 159 (Alaska 2017) (alterations in original) (footnote omitted) (quoting *Osterkamp v. Stiles*, 235 P.3d 178, 183 (Alaska 2010)).

[97] *See Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062-63 (Alaska 2005) ("We do not consider arguments that are inadequately briefed.").